Filed 4/29/14  In re F.B. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re F.B. et al., Persons Coming Under the Juvenile Court Law. | H040315 (Santa Clara County Super. Ct. Nos. 1-11-JD20350, 1-11-JD20351) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. D.B., Defendant and Appellant. | |

D.B. (father) appeals from the order terminating his parental rights to his two daughters, F.B. (born 2003) and S.B. (born 2007), after a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  Father argues that the juvenile court erred in failing to apply the parental relationship exception to adoption.  We disagree and affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.  *The Section 300 Petition and Initiation of the Case*

In 2007, the Santa Cruz County Human Resources Agency filed petitions alleging the children should be detained pursuant to section 300, subdivision (b) (failure to

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code. K.B. (mother) is not a part of this appeal.

protect).  The petitions alleged father and mother had tested positively for cocaine, and father had a criminal history including convictions for domestic battery.  The juvenile court sustained the petitions and ordered reunification services for the parents.  The children remained in their parents' care.

In January 2009, the parents became involved in an incident of domestic violence while the children were at home.  Police had been dispatched to the home due to a report of a domestic disturbance.  Upon arrival, officers observed that father appeared intoxicated, and mother appeared upset and fearful.  She had a laceration on her left cheek and a visible bruise, and she told officers that father had struck her with an unknown object.  Father was arrested, and mother obtained a criminal protective order against him.  Later that same month, police arrested father again.  Father, who was intoxicated, had been disturbing mother and the children while they were sleeping.

Thereafter, the Santa Cruz County Human Resources Agency filed a section 387 petition requesting protective custody of the children because of the incidents of domestic violence.  The juvenile court sustained the section 387 petition and ordered the children to remain with mother on the condition that father not reside in the home.  The court transferred the case to San Joaquin County.

2.  *The Proceedings in San Joaquin County*

The San Joaquin County Human Services Agency (Agency) prepared status review reports for the family maintenance review hearing in October 2009.  The report indicated the children, who were living with mother, were doing well.  The juvenile court continued family maintenance services.

In January 2010, father was arrested on an outstanding warrant at mother's house.  He was also arrested in March 2010 for battering a neighbor.  In April 2010, the juvenile court continued family maintenance services.

2

In September 2010, the Agency filed a section 387 petition requesting the court place the children with the maternal grandmother (grandmother).  The petition alleged that in January 2010, a social worker found father alone in mother's home.  Father was admonished for being in the house.  In March 2010 and June 2010, father was arrested for battering mother.  In July 2010, father was arrested for being in contempt of court at mother's house.  He had also been discharged from the San Joaquin County Domestic Violence Batterers Program in April 2010 due to excessive absences.  The court sustained the section 387 petition, authorized the children to be placed with grandmother, and transferred the case to Santa Clara County.

3.  *The Proceedings in Santa Clara County*

The Santa Clara County Department of Family and Children's Services (Department) prepared a disposition report in November 2010 recommending reunification services for both parents.  The juvenile court continued the children's placement with grandmother in December 2010 and ordered reunification services for both parents.  Father was ordered to submit to random alcohol and drug testing, complete a substance abuse self-help program, complete a substance abuse assessment, develop an aftercare relapse prevention plan, and participate in a 52-week batterer's intervention program.  He was authorized to have weekly supervised visits.

In January 2011, the Department prepared an interim review report.  Father had re-enrolled in a batterer's intervention program in December 2010 and had been drug testing.  He denied perpetrating domestic violence against mother and reiterated he did not believe he had a substance abuse problem.  However, he acknowledged he had made "poor decisions" in the past.  The Department prepared another interim review report in March 2011, indicating that the children enjoyed visits with their parents.  Father continued to deny he had committed domestic violence against mother.

3

**The June 2011 Status Review Report**

In June 2011, the Department prepared a status review report recommending reunification services continue for both parents. Father and mother were moving ahead with divorce proceedings. The children were seeing a therapist who reported they had been adversely affected from witnessing domestic violence in the home. Both children had previously experienced frequent nightmares.

Father had missed 10 drug tests but reported attending an Alcoholics Anonymous meeting, although he had not submitted any sign-in sheets recording his attendance. He had attended counseling sessions with his church's pastor. Father was enrolled in a domestic violence program but had three unexcused absences. Aside from his absences, father participated appropriately in the program and appeared genuinely interested in making changes to his life. The program facilitator stated that father had taken responsibility for yelling and threatening mother but had denied any recent physical abuse.

Father was regularly visiting the girls; however, the Department began supervising visits in April 2011 due to tensions between the father and the maternal grandparents. In one incident, F.B. called father to invite him to her talent show. F.B. became "very scared" afterwards and reported that father had told her he wanted her to live with him and that he was coming to pick her up. The step-grandfather smelled alcohol on father during one of his visits in April 2011. The social worker requested that the grandparents monitor calls between father and the children. F.B. said she did not want to live with father, although she enjoyed visits. The social worker concluded that neither parent had been consistent or had made substantive progress in their case plan.

In June 2011, the grandparents filed a request for de facto parent status. The court granted the request in July 2011.

**The September 2011 Status Review Report**

In September 2011, the Department prepared a status review report recommending reunification services to both parents be terminated and the matter be set for a section 366.26 hearing.

The report noted that father had missed eight drug tests between June 2011 and August 2011. Father had said he would not obtain a sponsor because he was not an alcoholic, would not participate in individual counseling, and would not participate in outpatient treatment. He minimized his drug and alcohol use and was terminated from his multi-offender DUI class and his batter's intervention program due to excessive absences. In August 2011, father was arrested for possession for crack cocaine. He tested positive for alcohol in June 2011. His visits with the children were described as pleasant but inconsistent.

The Department prepared an addendum report in October 2011. Father had re-enrolled in a batterer's intervention class, had begun individual counseling, and had completed an assessment. He said he was attending Alcoholics Anonymous meetings, but still had not submitted attendance sheets. His visits remained inconsistent. The maternal step-grandfather reported that F.B. smelled alcohol on father's breath in September 2011.

At the 12-month review hearing in October 2011, the juvenile court terminated reunification services and set a section 366.26 hearing for February 2012.

**The First Section 366.26 Hearing**

The Department prepared a report for the section 366.26 hearing in February 2012, recommending legal guardianship with the maternal grandparents as the permanent plan for the children. F.B. and S.B. were bonded with the grandparents and were excited about a permanent living arrangement with them. F.B. said she felt safe with her grandparents and could not imagine living anywhere else. Father's visits continued to be

5

inconsistent; he visited once every four to five weeks. The grandparents believed that the children would benefit from continued contact with mother and father, so long as the visits were safe and appropriate. Both children loved father and mother and expressed a desire to continue visitation.

After the section 366.26 hearing in February 2012, the juvenile court selected a permanent plan of guardianship with the grandparents. Father was authorized to have two supervised visits with the children per month.

**Father's Section 388 Petitions**

On December 21, 2012, father filed a section 388 petition seeking modification of the visitation order. Father requested the court grant him weekly visits with F.B., allow him to call F.B. twice a week, and allow him to take part in F.B.'s activities. The court ordered a hearing on his petition.

The Department filed a response to father's petition in April 2013, recommending the court deny father additional visitation with the children but allow supervised telephone contact. The Department recommended the court set a new section 366.26 hearing to determine if a change from legal guardianship to adoption was appropriate at this time. In its report, the Department asserted that F.B. said she enjoyed visits but did not want visits to increase, and she did not want to live with father. F.B. had nightmares about being forced to live with father, did not trust father, and believed he told lies. She was afraid of father hurting her and did not feel safe having unsupervised visits. S.B. was very attached to her grandmother. S.B. said that father hurt mother, and she wanted maternal grandfather to supervise visits. The children's therapist reported that both children were diagnosed with posttraumatic stress disorder due to the violence they had witnessed when they were younger.

6

On April 2, 2013, the juvenile court ordered father to continue to have twice-monthly supervised visits. The court also ordered one supervised 10-minute phone call per week and set a section 366.26 hearing for July 23, 2013.

Father filed a second section 388 petition on July 19, 2013, requesting the court dissolve the legal guardianship and return the children to him on a plan of family maintenance. The court ordered a hearing on his petition on July 23, 2013.

**The Contested Sections 388 and 366.26 Hearings**

The Department prepared a report in July 2013 for the section 366.26 hearing recommending termination of parental rights. Grandmother and step-grandfather were prepared to adopt the children. The children had been experiencing increased nightmares after father filed his section 388 petition to increase visitation. F.B. said she would like to be adopted by her grandparents, and she did not want to live with father again. F.B. said she had confronted father about an incident where he held a knife to mother's throat. Father denied the incident, which solidified F.B.'s distrust in him. F.B. said she understood adoption was permanent; however, she would feel safer and more secure if she were adopted. S.B. was too young to understand the difference between guardianship and adoption but was happy living with her grandparents.

In September 2013, the Department filed a response to father's section 388 petition. The Department asserted there was insufficient evidence that father was sober and that his circumstances had substantially changed. The Department argued that father continued to deny he perpetrated domestic violence against mother and had failed to complete any domestic violence services. The Department asserted that terminating guardianship would be detrimental to the psychological and emotional welfare of the children.

On September 13, 2013, the juvenile court held a hearing on the section 388 petition directly before the section 366.26 hearing.

7

*a. Father's Testimony*

Father testified during the section 388 hearing.  He said he had been released from probation in February 2013.  He was involved with his church and was attending services and volunteering.  Father had gone to counseling with his pastor on a weekly basis, which temporarily stopped when the pastor fell ill.  Father admitted using alcohol and cocaine in the past but said he had been clean and sober since March 2012.  He had completed a drug diversion program in February 2013 and was working with a sponsor.  Father had not attended any Alcoholics Anonymous meetings with his sponsor.  He had completed a batterer's intervention program sometime in 1995 but acknowledged that he had been terminated from the batterer's intervention program he attended during reunification services.

Father described his relationship with the children's mother as volatile.  He said that they would get into arguments that involved "yelling, screaming, [and] throwing of things [*sic*]."  Father admitted that some arguments had taken place in front of the children.  He denied physically hitting mother.  Father maintained that he had changed.  He was unable to complete his conflict accountability class because he was busy with work and was unable to afford the cost of the class.

Father said his daughters typically greeted him at visits with smiles and laughter and would call him "daddy."  During visits, he would take them to eat and would go on walks, watch videos, sing, or dance.  Visits usually ended with hugs and kisses.  Father acknowledged reading in one of the Department's reports that F.B. said he smelled like alcohol during one of his visits.  Father maintained that he was not drinking and was sober.

Father called his children on a weekly basis.  Most of the conversations were with F.B.  Father would talk to F.B. about her friends and what she was reading.  Father admitted that he read in the reports that F.B. said she was afraid of him.  He asserted he

8

did not want his daughter to be afraid of him, but he understood her feelings. Father loved his children unconditionally and believed they would benefit from placement with him.

### b. *Grandmother's Testimony*

Grandmother had been taking care of F.B. and S.B. for approximately three years. F.B. had told grandmother that she wished to live with her. F.B. had also told grandmother that she loved her parents but did not want to live with them. Both children enjoyed visits with father. However, F.B. did not want to be left alone with him.

### c. *Decision on the Section 388 Petition*

After considering the testimony provided during the hearing and the reports and attachments to the section 388 petition, the juvenile court commended father for the progress he was making but concluded that his circumstances had not sufficiently changed to warrant modification of the existing permanent plan. The court further determined that father had failed to show the proposed change would be in the children's best interest and denied his section 388 petition.

### d. *The Section 366.26 Hearing*

The parties stipulated that the court would accept father's testimony from the section 388 hearing for the section 366.26 hearing. The juvenile court accepted the Department's reports into evidence. Father testified again during the section 366.26 hearing, maintaining that he did not believe that his parental rights should be terminated. He reiterated that he loved his children and believed that they would benefit from having a relationship with him. Father's attorney asked the court not to terminate father's parental rights under the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B).

*e. The Juvenile Court's Decision*

The juvenile court took the matter under submission following the hearing. On September 27, 2013, it issued a written decision terminating father's parental rights and freeing the children for adoption. The juvenile court held that it found by clear and convincing evidence that F.B. and S.B. were adoptable and that adoption would be in the children's best interest. Additionally, the court concluded that father had not met his burden to prove that an exception to the adoption preference existed. The court found that father had maintained regular visitation with the children, and the children enjoyed visits with father. However, the children viewed their grandparents as their source of comfort and security and were thriving under the grandparents' care. The court concluded that father did not meet his burden to show the children would benefit from a continued relationship with him and found there was no compelling reason to believe terminating parental rights would be detrimental to the children.

Father filed a notice of appeal on October 28, 2013.

## DISCUSSION

Father argues that the juvenile court erred in terminating his parental rights because it failed to apply the beneficial parent-child relationship exception to this case. Before we address the merits of his claims, we briefly review the applicable law and legal framework.

*Statutory Framework*

After reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) A hearing under section 366.26 is held to design and implement a permanent plan for the child. At a section 366.26 hearing, the court must terminate parental rights and order the child placed for adoption if it determines, under the clear and convincing standard, that it is likely the child will be adopted. (§ 366.26, subd. (c)(1).)

10

Adoption is the preferred choice during the section 366.26 stage of the dependency proceeding. (*In re Celine R*., *supra*, 31 Cal.4th at p. 49; § 366.26, subd. (c)(1).) " 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R*., *supra*, at p. 53.) A statutory exception to the general rule requiring the court to choose adoption exists where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

In deciding whether the parent-child beneficial relationship exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.) The parent-child relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid*.)

A parent claiming the applicability of the parent-child relationship exception has the burden of proof. (See *In re C.B*. (2010) 190 Cal.App.4th 102, 133-134.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1350; see *In re Celine R*., *supra*, 31 Cal.4th at p. 53.)

11

The parent-child relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*Id.* at p. 1350.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact." (*Ibid.*) "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid.*)

*Standard of Review*

This court has determined that review of the applicability of the beneficial parent-child relationship exception under section 366.26 is governed by a hybrid substantial evidence/abuse of discretion standard of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*).)

"Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus, . . . a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. [¶] The same is not true as to the other component of . . . the parental relationship exception . . . [, which] is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue. It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

*The Juvenile Court's Discretion*

First, father argues that this court should reconsider the hybrid substantial evidence/abuse of discretion standard of review enunciated in *Bailey J.*, because it

13

impermissibly creates a third component to the two-part test to establish the existence of a beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i). He argues that in applying *Bailey J.*, a parent would have to show (1) there was regular visitation and contact with the child, (2) the child would benefit from continuing the relationship, *and* (3) there is a compelling reason to determine that termination of parental rights would be detrimental to the child. Father contends that under the plain language of section 366.26, subdivision (c)(1), a compelling reason is, by definition, established when a parent has shown regular visitation and benefit to the child from continuing the parental relationship.

We disagree with father's interpretation. The standard of review enunciated in *Bailey J.* does not create additional burdens on parents. *Bailey J.*, as previously noted, explains the applicable standard of review that we must apply as a reviewing court. The supposed "third" component father argues is created by the case--that there must be a compelling reason that the termination of parental rights would be detrimental to the child--is expressly a part of the statute. As articulated in *Bailey J.*, this is a discretionary decision made by the juvenile court based on the facts of the case. Section 366.26, subdivision (c)(1)(B) dictates that a court must terminate parental rights unless it "*finds* a compelling reason for determining that termination would be detrimental to the child." (Italics added.) One compelling reason is the beneficial parent-child exception. As we explained in *Bailey J.*, courts must "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption." (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

In sum, the hybrid standard of review enunciated in *Bailey J.* explains how a juvenile court should weigh the various factors in determining if an exception to adoption exists, and how an appellate court should review its decision. From the plain meaning of

14

the statute, it is clear the Legislature intended to give courts discretion to determine whether the exceptions listed in section 366.26, subdivision (c)(1)(B)(i)-(iv), including the beneficial parent-child exception, constitute a "compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) We therefore reject father's arguments on this point.

*Termination of Father's Parental Rights*

The juvenile court clarified in its order that it found father had maintained regular visitation with the children, which is supported by substantial evidence in the record. It also found by clear and convincing evidence that the children were adoptable, a finding that father does not contest. However, the juvenile court also found that father had not met his burden to prove the children would benefit from continuing their relationship with him, which father disputes on appeal.

In order to demonstrate the children would benefit from a continued relationship with him, father needed to demonstrate that maintaining the parent-child relationship would promote the children's well-being, outweighing the emotional benefits the children would gain in a permanent home with adoptive parents. (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 575.) In determining whether the relationship between parent and child is beneficial, we look to such factors as "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) The court's conclusion that father did not satisfy the second prong of the exception "turns on a failure of proof at trial, [such that] the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

15

F.B. and S.B. had been living with their grandparents for more than three years. They were bonded with their grandparents and enjoyed living with them. Both girls viewed their grandparents as their source of security and comfort. Father's interactions with the girls were mostly positive, but F.B. expressed she was fearful and distrusting of father. Both children, who had witnessed father's acts of domestic violence against mother in the past, experienced an increase in nightmares and sleep disturbances after visitation with father became more frequent in 2012. F.B. and S.B. also suffered from posttraumatic stress disorder as a result of their past trauma.

Certainly, there was evidence that the children enjoyed visits with father. F.B. said she loved her father unconditionally and liked visits. Father said the children called him "daddy" and visits often ended with hugs and kisses. However, frequent and loving contact with the children does not necessarily establish the existence of a benefit from continuing the parent-child relationship. (*In re Beatrice M*., *supra*, 29 Cal.App.4th 1411, 1418.) Father must also demonstrate he occupies " 'a parental role' " in the children's life, which he failed to do. (*In re Andrea R*. (1999) 75 Cal.App.4th 1093, 1108.) Father did not provide any evidence, aside from the fact that both children enjoyed visits, showing the children would be severely harmed if their relationship with him was severed. His love and concern for his daughters "do not equate to the day to day care and devotion the average parent expends on behalf of children." (*In re Debra M*. (1987) 189 Cal.App.3d 1032, 1038.) Accordingly, substantial evidence supported the juvenile court's conclusion that father failed to show that the children would benefit from continuing the relationship with him.

Furthermore, even if father had satisfied his burden to establish a beneficial parent-child relationship existed, his claim would still fail because the trial court would not have abused its discretion in finding that the exception did not present a "compelling reason for determining that termination would be detrimental to the child." (§ 366.26,

16

subd. (c)(1)(B).)  There is no dispute that the children were adoptable, and the grandparents were ready and willing to adopt.  Moreover, father had a history of domestic violence, did not adequately participate in his prior case plans, and had abused alcohol and drugs in the past.  In contrast, the grandparents had taken care of the children for an extended period of time, the girls were strongly bonded with them, and F.B. expressed a desire to be adopted.  S.B. was too young to understand the difference between guardianship and adoption but was very close with the grandparents and enjoyed living with them.  F.B. expressed fear and distrust of father, and S.B. still remembered father hurting mother.  The court's conclusion that severing the parent-child relationship in this situation would not deprive F.B. and S.B. of a substantial, positive emotional relationship such that they would be greatly harmed did not exceed the bounds of reason.  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Stephanie M.*, *supra*, 7 Cal.4th 295, 318-319.)

Additionally, the cases that father relies on in his argument are distinguishable.  *In re Brandon C.* (1999) 71 Cal.App.4th 1530 is procedurally different.  There, the juvenile court determined that termination of the mother's parental rights would be detrimental to the children.  (*Id*. at p. 1533.)  The appellate court affirmed after finding substantial evidence in the record supported the juvenile court's factual determination on that point.  In father's case, the juvenile court did *not* find that terminating parental rights would be detrimental to the children.  As the Department suggests, each dependency presents a different set of facts, and here there was substantial evidence supporting the juvenile court's determination that father did not satisfy his burden to show the children would benefit from a continuing relationship with him.

*In re Scott B.* (2010) 188 Cal.App.4th 452 is also distinguishable.  The mother in *Scott B.* appealed after the juvenile court terminated her parental rights, finding she failed to establish the beneficial parent-child exception.  The appellate court reversed.  There,

17

the court-appointed special advocate in the case had opined that it would be detrimental for the child if his relationship with mother was disrupted. (*Id*. at p. 472.) Furthermore, the child in *Scott B*. was strongly bonded with mother and emotionally accepted adoption only with the belief that the mother would be involved in his adopted family's activities. The child also expressed his desire to continue living with mother if possible and was strongly attached to the mother. (*Id*. at pp. 472-473.) Here, father did not submit nearly as much evidence in support of the beneficial parent-child relationship exception. Aside from showing that the children enjoyed visits, he did not demonstrate they were attached or bonded to him or that they would suffer detriment as a result of terminating his rights.

We also reject father's argument that establishing a legal guardianship as the permanent plan is somehow preferable, because legal guardianship would afford the children the necessary and desired stability and permanence while allowing the children to have a relationship with father. The Legislature has recognized that " '[a]lthough guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.' " (*In re Beatrice M*., *supra*, 29 Cal.App.4th at p. 1419.)

**DISPOSITION**

The order terminating father's parental rights to F.B. and S.B. is affirmed.

_____
                                    Premo, J.


WE CONCUR:


_____
        Rushing, P.J.


_____
        Elia, J.

19